IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

ROEL and JEAN VAUGHN,            )
                                 )
              Plaintiffs,        )
                                 )
v.                               )          Civil Action No.:  4:09-cv-0570-VEH
                                 )
HYSTER COMPANY, INC., et al.,    )
                                 )
              Defendants.        )

BRIEF IN SUPPORT OF MOTION TO EXCLUDE OPINION TESTIMONY
OF EMMETT E. ("BUDDY") GAMEL, III AND THOMAS F. TALBOT

Defendant NACCO Materials Handling Group, Inc. ("NACCO"), respectfully

submits the following brief in support of its motion to exclude the opinion testimony

of the two purported expert witnesses proffered by Plaintiffs, *i.e.*, Emmett E.

("Buddy") Gamel, III and Thomas F. Talbot.

I.      Introduction

As this court is aware, Plaintiff Roel Vaughn brought this products liability

case against NACCO under the Alabama Extended Manufacturers' Liability Doctrine

("AEMLD"), after he was injured on the job while operating a commercial-grade,

narrow aisle "stand-up" lift truck, or "forklift," which was manufactured by

NACCO's predecessor, Hyster Company, Inc.  The injury at issue occurred when

Vaughn, while standing up inside the lift truck, placed his arms and parts of his body

outside the operator's compartment in order to view a label on a box more closely, in violation of clear warnings on the truck and in the operator's manual, which warned of a "crush hazard," and instructed him to "use common sense" and to "[k]eep arms, legs and head inside operator's compartment."

It is well-established that, in order to succeed on a claim under the AEMLD, a plaintiff may not simply rely on proof of accident and injury, but must affirmatively show both that the product was defective, and that a safer, practical, alternative design could have been implemented at a reasonable cost by the manufacturer. Howze v. Toyota Motor Corp., 2000 WL 210260 at *2 (S.D. Ala. Jan. 24, 2000) ("Under the AEMLD, a plaintiff has the burden of establishing (1) the defective condition of the product; and (2) a reasonable, practical, alternative design, by means of expert testimony.").  In a complex case such as this one, involving an industrial-use narrow aisle lift truck, neither showing can be made in the absence of competent expert testimony.  Id; Townsend v. General Motors Corp., 642 So.2d 411, 415, 423 (Ala. 1994); Donnelly v. Club Car, Inc., 724 So.2d 25, 27-28 (Ala. Civ. App. 1998); Cooper v. Toshiba Home Tech. Corp., 76 F. Supp. 2d 1269, 1276 (M.D. Ala. 1999); see also Dancy v. Hyster Co., 127 F.3d 649, 653 (8th Cir. 1997).

Early in this case, this court entered a scheduling order providing deadlines for the parties to disclose any retained expert witnesses and to provide complete reports

from those experts as required under Rule 26(a)(2)(B).  NACCO retained three experts to provide opinion testimony in this case and disclosed those experts in accordance with the deadlines established in the scheduling order.  Vaughn allowed this court's deadline to pass without disclosing any purported experts.  Nevertheless, after NACCO filed a motion for summary judgment based in part on the failure of Vaughn to provide competent expert witness testimony, Vaughn produced affidavits from two previously undisclosed witnesses who proffered opinion testimony concerning alleged design and warning defects with the lift truck at issue: Emmet E. ("Buddy") Gamel, III, and Thomas F. Talbot.

In accordance with this court's revised scheduling order — issued following the untimely disclosure of these witnesses — NACCO has now taken the depositions of Mr. Gamel and Mr. Talbot.  Both of these witnesses essentially stated that they endorse an untested, non-manufacturer-approved "fix" consisting of a wire mesh guard and bumpers installed on a single lift truck after the accident by Vaughn's employer, Federal Mogul.  However, their testimony reveals fatal foundational flaws with their opinions concerning this "fix," and concerning the unaltered design of (and warnings about) the lift truck at issue in this case.  Specifically, Mr. Gamel's testimony as to his background, training, and education shows undisputably that he is not qualified to render expert opinions concerning the design (as opposed to the

3

repair) of commercial lift trucks or the warnings to be provided in connection with the use of such trucks.  Moreover, both Mr. Gamel and Mr. Talbot have based their purported "expert" opinions on their own, subjective notions of common sense and perceived reasonableness, and — by their own admission — *not* on any sort of empirical data, objective testing or analysis, study of industry standards, or review of pertinent literature.  Indeed, both of these witnesses admitted that they did not even bother to consult any of these widely-accepted sources before forming their opinions, and confess to having no knowledge as to whether such sources of information would support their opinions.

The raw, uninformed opinions of Mr. Gamel and Mr. Talbot are not due to be regarded any differently than those of average lay persons; and, therefore, are inadmissible under the standards of Federal Rule of Evidence 702 and the Supreme Court's expert witness jurisprudence.  Accordingly, it is the duty of this court, as "gatekeeper" under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 n.7, 597 (1993), to enter an order excluding the opinions of these witnesses from the evidence in this case.  See generally United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*) ("The importance of Daubert's gatekeeping requirement *cannot be overstated*.") (emphasis supplied).

4

II.   <u>Factual Background</u>

As set forth above, on March 2, 2007, Vaughn sustained an arm injury while operating a lift truck manufactured by Hyster Company, Inc., the predecessor of NACCO. (Complaint, ¶¶ 2-3). The accident occurred while Vaughn was operating a Hyster "stand-up" forklift truck, which he had regularly operated since December of 2004. (Vaughn Depo., at pp. 27, 103-104, 106, 143 and Ex. 26-A to Vaughn Depo.). According to Vaughn, he maneuvered the lift truck into an aisle and stopped the vehicle to the left of some shelves containing automotive parts. (Vaughn Depo. at pp. 210-214). Vaughn then looked down and to his right toward two pallets on the floor in an attempt to locate parts he needed to lift with the truck and move onto another pallet. (<u>Id</u>. at pp. 220, 224-25, pp. 153-54). While holding in his right hand a label identifying the parts he needed to move, Vaughn leaned to his right to get a closer look at the pallets on the floor. (<u>Id</u>. at pp. 214-215, 223, 228). Vaughn testified that "[o]ne second I was looking at this label, and the next second I knew something bad had happened, and I was turned like sideways, and my arm was dangling." (<u>Id</u>. at pp. 231-32). Vaughn's right arm apparently struck a portion of the shelving and was severely injured. (<u>Id</u>. at pp. 245-247 and Exhibit 26-M to Vaughn Depo.). Vaughn does not know how the accident occurred, but he does not believe that the vehicle moved on its own. (Vaughn Depo., at pp. 30, 267-269). In a section

5

warning operators to "use common sense," the operating manual for the lift truck operated by Vaughn warned that operators should "[k]eep arms, legs, and head inside operator's compartment."  (Operating Manual, Defendant's Exhibit 4 to Vaughn Depo., at p. 6).  Vaughn also acknowledged that there were various warning labels on the vehicle.  (Vaughn Depo., at pp. 110-111).  Vaughn testified that "I saw them on there, and I'm sure I read part of it, but I don't know if I read letter for letter."  (Id., at p. 111).  Like the operating manual, the warning labels instructed operators to "[k]eep arms, legs and head inside operator's compartment."  (Vaughn Depo., at Defendants Exhibits 10A-10E).  Furthermore, prior to this incident Vaughn took and passed an operator's exam for the lift truck, and correctly characterized as "false" the following statement from the exam:  "it is OK to have your feet or hands outside the running lines of the equipment."  (Vaughn Depo., at p. 121; Exhibit 24 to Vaughn Depo., at p. 6).  At his deposition, Vaughn agreed again that he "knew it was not okay to have your hands and feet outside of the operator's compartment of the vehicle."  (Vaughn Depo., at pp. 121).

In an attempt to sustain his burden of proving a defective product and inadequate warnings under the AEMLD, Vaughn has filed affidavits and purported "expert" reports from Emmett E. ("Buddy") Gamel, III, and Thomas F. Talbot.  Mr. Gamel has a high school diploma, he attended just one class at Jefferson State

Community College on computer basics, and he is not "trained as an engineer in any way." (Gamel Depo., pp. 17, 28). Mr. Gamel has never attended any sort of technical seminar or class on lift trucks or forklifts, has never published any materials or otherwise been involved in the design of a stand-up lift truck, and admittedly has no training with respect to the design or safety of stand-up narrow aisle forklifts other than what he describes as "*a degree of common sense*." (Id. at p. 38; see also id. at pp.16, 26, 36, 49) (emphasis supplied).

Mr. Gamel's supposed qualification for the opinions that he expresses with respect to the design of and warnings for the lift truck in question in this case apparently are alleged to stem from his experience as a self-taught *mechanic*, performing repairs on industrial vehicles. (See id. at p. 17). Mr. Gamel testified that he "was raised in a family that worked on trucks and cars," (id. at p. 11), and he runs a business that is a "*repair facility* for commercial and industrial vehicles." (Id. at p. 9) (emphasis supplied). However, Mr. Gamel testified that in the last ten years, he has operated a stand-up lift truck a grand total of "maybe two or three" times, for less than an hour, and he further testified that he has never operated or worked on the model lift truck at issue in this case. (Id. at pp. 60, 78-79). More importantly, Mr. Gamel's testimony reveals that he has never "done any design work with respect to

a powered industrial vehicle of any kind," and has never been involved in "[e]ither redesigning or designing" a forklift from the conceptual stage. (Id. at p. 26).

Mr. Gamel did not redesign the lift truck at issue in this case in an attempt to illustrate a practical alternative design, either. Rather, Mr. Gamel spent a few hours at the Federal Mogul facility where the lift truck involved in Vaughn's accident is located, and simply looked at certain modifications that were made to that single lift truck following the incident. (Id. at pp. 24, 21). That lift truck has been modified, not by the manufacturer, but by Federal Mogul, to include a wire mesh cage around the right side of the operator's compartment, and to include a rubberized bumper around the exterior of the truck. Mr. Gamel approves of this redesign, and testified that in his opinion the unaltered lift truck is defective in terms of design.[1] But in so opining, Mr. Gamel literally relies on nothing other than his own personal visual inspection of this modified lift truck. (Id. at pp. 20-21).

Among other omissions, Mr. Gamel has not reviewed any regulations promulgated by the Occupational Safety and Health Administration ("OSHA"),

---

[1] Mr. Gamel also testified that he would have made one additional change, *i.e.*, adding a détente button to the operator's control (or "joystick") without which the control would not operate. (Gamel Depo., at pp. 45, 39). However, Mr. Gamel testified that he had never seen such a button on a forklift, had not undertaken to design or test any such button, has never seen any literature on such a button, and has no idea whether such a button would be accepted in the industry. (Id. at p. 46).

American National Standard Institute ("ANSI") design standards, or other documents which pertain to powered industrial vehicles, and he testified he is not familiar with such standards so he could not assess whether the alterations would even comply with those standards.  (Id. at p. 25).  Of course, OSHA regulations affirmatively require that all "powered industrial trucks acquired and used by an employer," including "fork trucks" such as the one at issue in this case, "shall meet the design and construction requirements for powered industrial trucks established in the "American National Standard for Powered Industrial Trucks, Part II, ANSI B56.1-1969."  29 C.F.R. § 1910.178(a)(2).

In addition to neglecting to review any standards, Mr. Gamel did not attempt to determine why the vehicle was originally designed without an operator cage or bumpers like those installed after the incident on a single lift truck by Federal Mogul. (Id. at pp. 68-69).  He did not review any documents from Federal Mogul concerning the alterations, or perform any research to determine whether the modifications made by Federal Mogul are generally accepted by the powered industrial vehicle industry. (Id. at pp. 25, 37-38, 69). He also did not operate the vehicle or test the changes made by Federal Mogul in any way to determine whether they are practical, safe, effective, or whether they create collateral operation or safety issues such as reduction of operator visibility, pinch hazards, or the like.  (Id. at pp. 37, 53, 54, 55, 57, 58-59).

9

Indeed, Mr. Gamel did not even put pen to paper in order to draft his own analysis of the alleged problems with the lift truck: he testified that his expert report "was written by Mr. Alspaugh," counsel for Vaughn, and after review of Mr. Alspaugh's craftsmanship, Mr. Gamel accepted "the rough draft as it was," with "[n]o changes." (Id. at pp. 28, 29).  In other words, Mr. Gamel truly did nothing more than look at the alterations, state "*I think it would be a good idea*" to have included such alterations in the original design, and sign his name to a report drafted by Vaughn's lawyer.  (Id. at pp. 36-37) (emphasis supplied).

Mr. Talbot's analysis (or lack thereof) was much the same as that of Mr. Gamel.  Mr. Talbot actually is trained as an engineer, but he testified that, like Mr. Gamel, he has never been involved in any way in designing a stand-up narrow aisle lift truck, nor has he ever proposed or specifically designed a guard or bumpers for such a truck.  (Talbot Depo., at pp. 10, 32, 35, 40, 44-45).  Nor did Mr. Talbot attempt to design any alternative safety system for the lift truck at issue in this case.  (Id. at p. 61).  Instead, Mr. Talbot simply spent a few hours at Federal Mogul's facility looking at the modified single lift truck, and concluded based on that review alone that Hyster "should have designed some sort of a strain to keep an operator from getting his body part out."  (Id. at p. 57).  But Mr. Talbot did not provide any details as to what sort of guard should have been created, and he stopped short of endorsing

Federal Mogul's design, at one point responding to a question by stating: "you are asking me to say that I approve of the details of their design.  I approve of *a concept of their design.*"  (Id. at p. 77) (emphasis supplied).  He further testified that "[t]here may be a better design," but "I have not attempted to obtain one." (Id. at p. 57; see also id. at p. 61).

In addition to not endeavoring to fashion his own alternative design, Mr. Talbot failed to subject Federal Mogul's design to any sort of serious scientific scrutiny. Like Mr. Gamel, Mr. Talbot did not perform any tests of this design or of any similar design, either to assess whether it truly provides increased safety from crush hazards, object intrusion or other dangers, to assess vision impairment issues, or to analyze collateral risks presented by the design.  (Id. at pp. 62, 64, 66, 77, 139).  As an example, the most he did in terms of assessing visual impairment was, in his own words, "perform[] what I will call minimal observations of how it would affect the operator and what his restrictions would be."  (Id. at p. 63).  These "minimal observations" were made exclusively during a one-time visit to Federal Mogul's facility, and they were not even made during operation of the unit, because Mr. Talbot is "not licensed" to operate forklifts.  (Id.).  Instead of operating the unit himself, asking licensed operators how they felt about visibility, or designing some sort of test course or protocol to assess operator error under the Federal Mogul design, Mr.

11

Talbot testified that he simply "stood [on the stationary unit] in the position where the operator was and looked, and *I felt like* he could still see." (Id. at p. 67) (emphasis supplied). Likewise, while expressing an opinion that the operator's control (or "joystick") on the forklift ought to have some sort of "détente switch," Mr. Talbot made clear that he has "not looked at the ergonomics of it" or come up with any actual design of an effective switch. (Id. at pp. 134, 135).

In yet another example of his complete failure to perform any sort of scientific analysis, Mr. Talbot did not attempt to reinforce his knee-jerk, lay judgments by performing any actual research into whether such designs have been accepted by federal regulators, manufacturers, industry groups, businesses, or academics. Indeed, Mr. Talbot testified, "I don't know anything about the design" when asked whether he was familiar with any safety measures used by other manufacturers of lift trucks. (Id. at p. 65). He further conceded that he has no knowledge whatsoever as to why the particular lift truck at issue in this case was designed without a guard, or as to whether the concept of guarding the right side of an operator's compartment is generally accepted in the lift truck industry. (Id. at pp. 14, 62, 64, 65, 126, 140-41). With respect to the détente switch, Mr. Talbot again conceded that he simply does not know whether such a switch has been evaluated by academics or industry experts, and

admits that he has no clue whether the presence or absence of such a switch has been considered by or accepted in the industry.  (Id. at pp. 134-35).

Asked if he had performed any research into the general concept of guarding an operator's compartment on a lift truck, Mr. Talbot testified "I have made no attempt to determine what literature's been published."  (Id. at p. 140).  In fact, Mr. Talbot did not even bother to review any federally-binding OSHA regulations or incorporated ANSI standards until the very morning of his deposition — well "after [he] reached [his] conclusions" — at which point he "scanned them," but did not "review[] it carefully."  (Id. at p. 25).

These failings are not minor analytical errors.  Mr. Talbot himself admitted that the addition of the wire mesh and bumpers "could create a different problem," *i.e.*, it could lead to a situation where "something . . . could get caught," or the operator "could hit something sooner."  (Id. at p. 72).  But Mr. Talbot does not know whether the modifications at issue here present those problems, or whether they comply with current regulations or standards, because as he admitted toward the end of his deposition, the truth is that he has not "studied this truck from a safety standpoint." (Id. at p. 153).

Mr. Talbot also expressed opinions concerning the efficacy of the warnings utilized by Hyster without supporting such opinions with any degree of scientific

13

backing.  Testing the efficacy of warnings is easy enough: as Mr. Talbot testified,

"[t]he only way you know if a warning is effective is to have people read it, look at

it, use the equipment and see if it affects their behavior."  (<u>Id</u>. at p. 128).  But Mr.

Talbot undertook no testing whatsoever with respect to the warnings, choosing

instead to simply state that, in his humble opinion, things might have been stated in

a different manner.  (<u>Id</u>. at pp. 126-28).  In stating these baseless opinions, he did not,

for instance, consider any warnings utilized by other manufacturers, consult industry

standards, or review literature or standards regarding the efficiency or effectiveness

of the particular warnings that Hyster used.  (<u>Id</u>. at pp. 126-27).

## III.   <u>Argument</u>

The starting point for any discussion of the admissibility of opinion testimony

offered by so-called "expert witnesses" is Federal Rule of Evidence 702.  See, e.g.,

<u>United States v. Frazier</u>, 387 F.3d 1244, 1259 (11th Cir. 2004) (<i>en banc</i>).[2]  That Rule

was amended in response to the Supreme Court's decisions in <u>Daubert v. Merrell</u>

---

[2] The admissibility of expert testimony in this federal action based upon the court's diversity jurisdiction is a matter of federal evidentiary rules, and not state procedural principles.  <u>McDowell v. Brown</u>, 392 F.3d 1283, 1294 (11th Cir. 2004); <u>Long v. Raymond Corp.</u>, 2007 WL 2376785, at *3 (11th Cir. Aug. 21, 2007) (rejecting an argument that the Alabama Rules of Evidence apply to a federal court's determination of an expert witness's qualifications); see also <u>Scott v. Sears, Roebuck & Co.</u>, 789 F.2d 1052, 1054 (4th Cir. 1986) (holding that "the admissibility of expert testimony in a federal court sitting in the diversity jurisdiction is controlled by federal law").

Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael,

526 U.S. 137 (1999).[3]  As so amended, Rule 702 now provides as follows:

> If scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness *qualified as an expert* by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon *sufficient facts or data*, (2) the testimony is the product of *reliable principles and methods*, and (3) the witness has *applied* the principles and methods *reliably to the facts* of the case.

Fed. R. Evid. 702 (emphasis supplied).  The requirements of this Rule can be grouped

under three broad headings:  qualifications, reliability, and helpfulness.  See, e.g.,

Frazier, 387 F.3d at 1260; Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.,

326 F.3d 1333, 1340 (11th Cir. 2003) (discussing the "three part inquiry [used] to

determine the admissibility of expert testimony under Fed. R. Evid. 702").

The Supreme Court's decision in Daubert — which charged district courts with

acting as "gatekeepers" in the considering the admissibility of "expert" testimony —

requires:

> a *rigorous inquiry* to determine whether:  "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently

---

[3] "In Daubert the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in Kumho clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science."  Advisory Committee Note to Fed. R. Evid. 702 (2000 Amends.).

reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

<u>Rink v. Cheminova</u>, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (emphasis supplied) (quoting <u>City of Tuscaloosa v. Harcros Chemicals, Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted)); see also <u>Frazier</u>, 387 F.3d at 1260 ("While there is inevitably some overlap among the basic requirements . . . they remain distinct concepts and the courts must take care not to conflate them.").[4]

The burden of satisfying the district court that these three elements are present in a given case falls upon the party *proffering* the expert witness, and not the party seeking the witness's exclusion. See, e.g., <u>Rink</u>, 400 F.3d at 1292 ("The party offering the expert has the burden of satisfying these three elements by a preponderance of the evidence.") (citing <u>Allison v. McGhan Medical Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999)); <u>McDowell v. Brown</u>, 392 F.3d 1283, 1298 (11th Cir. 2004) (applying the same principle); <u>Frazier</u>, 387 F.3d at 1260 (same). For the reasons that follow, Vaughn simply cannot carry this substantial burden, and the

---

[4] Although this categorization refers to Rule 702's three-part litmus test concerning reliability in a consolidated fashion, the fact is that reliability cannot be found unless the three requirements of Rule 702 — *i.e.*, sufficient facts or data, reliable methodology, and reliable application — are met.  Fed. R. Evid. 702(1)-(3).

opinion testimony proffered by Mr. Gamel and Mr. Talbot must be excluded in its entirety.

> A.   Buddy Gamel is Not Qualified to Render Expert Opinions Concerning the Design or Safety of Narrow Aisle Lift Trucks or to Opine Regarding the Sufficiency of Safety Warnings on Such Trucks

Rule 702 makes clear that in order to be permitted to offer opinion testimony, a witness must be qualified to render opinions of the caliber customarily rendered by experts in the relevant field, as opposed to opinions that might be uttered by any layperson endowed with "a degree of common sense." (Gamel Depo., at p. 38). Under Rule 702, a witness may be qualified as an expert by virtue of his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. However, the qualifications of the witness must correlate closely with the subject matter of the proposed testimony. See, e.g., Montgomery v. Nova, 168 F.3d 1282, 1303 (11th Cir. 1999) (upholding the district court's exclusion of an expert's testimony where the district court found that the field of the expert's expertise and the field on which his testimony was based were "distinguishable"); see also Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378, 392 (D. Md. 2001) ("[A]n expert who is a mechanical engineer is not necessarily qualified as an expert on any issue within the vast field of mechanical engineering.").

In this case, the relevant field is that of forklift design, and specifically the design of forklift safety features.  See generally Howze v. Toyota Motor Corp., 2000 WL 210260 at *2 (S.D. Ala. Jan. 24, 2000) ("Under the AEMLD, a plaintiff has the burden of establishing (1) the defective condition of the product; and (2) a reasonable, practical, alternative design, by means of expert testimony.").  Buddy Gamel testified in this case that he possesses a high school diploma and has attended a single computer course at Jefferson State Community College.  (Gamel Depo., pp. 17, 28). He has never authored any articles on forklifts, forklift safety or design, nor is he familiar with the pertinent ANSI standards.  (Id. at pp. 25, 49).  It is quite obvious, therefore, that he is not qualified as an expert in the field of forklift design by virtue of any educational achievements or academic study.  Mr. Gamel further testified that he has not attended any sort of technical seminars on forklifts, reviewed relevant literature, or received training with respect to forklift safety or forklift design, and he conceded that he is not "trained as an engineer in any way." (Gamel Depo., pp. 17; see also id. at pp. 16, 28, 26, 36, 49).  Thus, he cannot reasonably be deemed an expert in the field of forklift safety or design as a result of any sort of training.

Mr. Gamel instead attempted to relate his qualifications in terms of the "on-the-job experience" that he has gained as a *mechanic* performing *maintenance* and *repairs* on industrial vehicles and machinery, including forklifts.  (Id. at p. 17)

18

(emphasis supplied).  However, Mr. Gamel testified that he has never worked *at all* on the forklift model at issue in this case.  (Id. at p. 60).  Moreover, Mr. Gamel's testimony reveals quite clearly that while he may rightfully boast experience with the *mechanical operations* and *repair* of lift trucks *in general*, he has never performed any *design work* or *safety design* with respect to a powered industrial vehicle of any type.  (Id. at p. 26).[5]  Mr. Gamel specifically testified: "I am not a design engineer." (Id. at p. 47).    Indeed, when pressed on the point at his deposition, the *only* qualification Mr. Gamel could muster in support of his expertise in the field of forklift design or safety was "*a degree of common sense*."  (Id. at p. 38) (emphasis supplied).

In other words, the extent of Mr. Gamel's purported qualifications for rendering an "expert" opinion in this case is his experience performing *mechanical repair work* on *other models* of lift trucks, and his alleged "common sense" ability to comprehend the design of safety features for lift trucks.  Neither of these proffered credentials render Mr. Gamel qualified under the rigorous standards erected by Rule 702.  Courts have repeatedly explained that "forklift design" involves "complex

---

[5] Mr. Gamel did point out that he has created a boom lift *attachment* for a forklift for his own use, but this attachment was merely used for extending the forks of the truck, and was not related to safety or to general forklift design itself.  (Id. at pp. 26-27).  Mr. Gamel confirmed that he has never been involved in any way in the design of a guard or bumpers for a stand-up narrow aisle lift truck.  (Id. at p. 36).

safety issues." Ortiz v. Yale Materials Handling Corp., 2005 WL 2044923 at *11 (D.N.J. Aug. 24, 2005) (also noting that "a jury would not be able to simply look at [a forklift's] design and determine whether or not it was defective.  Rather, an expert's testimony is necessary"); see also, e.g., Brown v. Raymond Corp., 432 F.3d 640, 643-44 (6th Cir. 2005) (agreeing that a forklift is a "complex industrial machine"); Kirk v. Hanes Corp. of North Carolina, 16 F.3d 705, 708 (6th Cir. 1994) (same).  In light of the obvious complexity of the issues involved in designing a forklift — and especially in attempting to render such a vehicle safe — it is beyond doubt that mere "common sense" cannot form any basis for an *expert* opinion on the subject.  Thomas v. Evenflo Co., Inc., 205 Fed. Appx. 768, 772 n.3 (11th Cir. 2006) (affirming district court's decision striking an expert opinion which was based on nothing more than "common sense"); Covas v. Coleman Co., Inc., 2005 WL 6166740, at * 9 n.8 (S.D. Fla. June 27, 2005) (excluding opinion testimony where the alleged expert "relied on common sense").

Without relying generally on his "degree of common sense," all Mr. Gamel has to fall back on in rendering opinions concerning the *design of safety features* for the Hyster forklift at issue in this case is his general experience in the completely separate realm of *repairing* mechanical aspects of *other models* of forklifts.  Again, this does not suffice.  However familiar Mr. Gamel has become with repairing the various parts

of forklifts — all of which were designed by the manufacturer — he has demonstrated no knowledge, experience, training, or other skills sufficient to render him even minimally qualified to design a forklift or to evaluate the various considerations that go into designing such a machine and selecting appropriate safety features. Accordingly, he cannot be allowed to share his uninformed lay opinions concerning the suitability of the safety features on the lift truck at issue in this case.  See, e.g., Wiley v. Volkswagen of America, Inc., 805 F.2d 394, * 3 (4th Cir. 1986) (Table, text in Westlaw) (holding that "a skilled automobile mechanic who specialized in the repair and modification of Volkswagens" was not, merely by virtue of that experience, "an expert in any aspect of automotive design," and therefore "was not qualified to testify as an expert on the design of rear suspension systems"); Deutz Corp. v. City Light & Power, Inc., 2009 WL 2986415, at * 4 (N.D. Ga. Mar. 21, 2009) ("[W]hile Dr. Avitan may have been qualified to offer expert opinion about the subject *engine* and its *mechanics*, he was not qualified . . . to offer opinions regarding *corrosion* of the subject engine's *bearings*") (emphasis supplied); Weisgram v. Marley Co., 169 F.3d 514, 518 (8th Cir. 1999) ("Although Freeman clearly was qualified as a fire cause and origin expert, there is no question that he was not

21

qualified to offer an opinion that the Weisgram heater malfunctioned and he should not have been permitted to do so.").[6]

> B. The Opinions Proffered by Buddy Gamel and Thomas Talbot Both Fail the "Rigorous" Reliability Test of Rule 702

As the foregoing analysis illustrates, at least one of Vaughn's proposed "expert" witnesses, Buddy Gamel, does not possess the qualifications necessary to be accorded that status in the fields of forklift design and forklift safety feature design. Of course, even if both he and Mr. Talbot could be regarded as sufficiently qualified, "caselaw plainly establishes that one may be considered [a qualified] expert but still offer unreliable testimony." Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1342 (11th Cir. 2003); see also Wilson v. Taser Intern., Inc., 303 Fed. Appx. 708, 714 (11th Cir. 2008) ("A medical degree does not authorize Dr. Meier to testify when he does not base his methods on valid science"). The above-referenced reliability inquiry mandated by Federal Rule of Evidence 702 has three parts, and the opinions of Mr. Gamel and Mr. Talbot fail every facet of the test.

---

[6] See also generally Kerns v. Sealy, 2007 WL 2012867, at * 8 (S.D. Ala. July 6, 2007) ("Because Damant is an expert in the flammability of consumer products that contain polyurethane foam, plaintiffs reason, he must also be an expert in evaluating the risk of fire in the application of spray-on polyurethane foam insulation to an attic. This contention is not logical and cannot be credited. . . . A beekeeper is not rendered an expert in the health and nutritional effects of honey on small children simply because he breeds insects that produce honey.").

Under Rule 702, opinion testimony proffered by a qualified expert witness is admissible only if the district court finds that:

> (1) the testimony is based upon *sufficient facts or data*, (2) the testimony is the product of *reliable principles and methods*, and (3) the witness has *applied* the principles and methods *reliably to the facts* of the case.

Fed. R. Evid. 702 (emphasis supplied).  In applying this tripartite test, there are a number of additional criteria that courts consider important with respect to each element.  Through it all, however, "the focus . . . must be solely on *principles* and *methodology*, *not* on the *conclusions* that they generate."  <u>Daubert v. Merrell Dow Pharmaceuticals, Inc</u>., 509 U.S. 579, 595 (1993) (emphasis supplied).

A review of the testimony of Mr. Gamel and Mr. Talbot shows that principles and methods played no role whatsoever in generating the proffered conclusions, and certainly did not guide what little analysis was performed.  Rather, the scientific method was completely eschewed in favor of an apparent desire to enunciate a quick, knee-jerk, "common sense"-style solution to a complex design issue — without the benefit of adequate facts, research, peer-review, testing, or consideration of potential negative ramifications.

1.     The Opinions of Mr. Gamel and Mr. Talbot Are Not
       Based Upon Sufficient Facts or Data

The existence of a sufficient factual predicate for expert opinions is "a basic foundation for admissibility."  United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004) (*en banc*); Wright & Gold, 29 Federal Practice & Procedure:  Evidence § 6266 (2007) ("The question is whether the expert considered *enough* information to make the proffered opinion reliable.") (emphasis in original).  "If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." In re Agent Orange Product Liab. Litig., 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (3d Cir. 1987).

As outlined in detail above, essentially the *only* information truly relied upon by either of Vaughn's proffered "experts" in reaching their opinions in this case is that which was gathered during a relatively short, visual inspection of the modified lift truck at Federal Mogul's facility and review of the operator's manual.  Of course, a review of the manual and a visual inspection of the modified lift truck was a necessary component of the analysis, but it is simply impossible to accept that such an inspection was a *sufficient* basis for the opinions proffered by the experts.  In order to determine, as they did, that "a safer, practical, alternative design was available to

the manufacturer," Haney v. Eaton Electrical, Inc., 528 F. Supp. 2d 1262, 1269 (N.D. Ala. 2007), the law requires consideration of factors such as "the intended use of the product," its existing "safety aspects," and "the utility of the alternative design" as compared to "the utility of the design actually used." Id. In addition, of course, one cannot logically conclude that an alternative design is "safer, practical," and "available," unless actual evidence exists to valid such facts.

Here, however, the only evidence considered by the purported experts is the existence of a single lift truck retrofitted by Federal Mogul to include some form of operator cage and bumpers. Of course, the mere existence of this after-market "fix" does not show that it is safe or practical, nor does its existence demonstrate that it has equal utility to the manufacturer's version of the lift truck. In order to assess such factors, it would be necessary to analyze the "fix" through some sort of scientifically-valid method that analyzes matters such as: the ability of the cage or bumper to stand up to impact and prevent injury; the likelihood (and danger presented by) object intrusion into the cage; the negative implications (such as reduction of operator visibility and travel radius) of the cage and bumper system; the opinions of operators and purchasers; the creation of additional or new hazards; compliance with federal regulations, industry standards, and customer demands; and myriad other variables. But neither Mr. Gamel nor Mr. Talbot took any these factors into consideration.

25

Merely by way of *example*, Mr. Gamel testified that he has not "done a complete analysis" of whether the bumper even would have prevented Vaughn's injury, and further did not bother to look into how the addition of bumpers and the cage could have put the operator at risk of other injuries. (Gamel Depo., pp. 53, 59). Similarly, Mr. Talbot testified that both the bumpers and the wire mesh cage installed on the right side of the truck "could create a different problem," but conceded that he had not performed any tests to ascertain the significance of such problems. (Talbot Depo., pp. 71-72). Furthermore, both Mr. Gamel and Mr. Talbot failed to measure the size of the gaps in the wire mesh to assess object intrusion potential or regulatory compliance, and because of the absence of any testing, Mr. Talbot was "not willing to state the design is strong enough from a strength standpoint." (Id. at p. 77; see also id. at p. 73; Gamel Depo., pp. 56-57). Despite recommending a détente switch, Mr. Talbot and Mr. Gamel both made clear that they had not reviewed any literature or industry standards or practices to determine whether such switches were commonplace or accepted, and further had not "looked at the ergonomics" of how such a switch would need to be designed, if it could be designed. (Talbot Depo., p. 134; see also Gamel Depo., p. 46).

In terms of visibility reduction as a result of the operator screening, Mr. Talbot testified that all he did to assess it was "stand on the unit and . . look," and Mr. Gamel

did the same. (Talbot Depo., p. 69; see also Gamel Depo., pp. 54-55). Neither purported expert operated the vehicle, and they apparently did not bother to ask operators in any sort of systematic manner (or at all) whether the screening impacted their ability to operate the vehicle. (Id.). Instead of eliciting factual information or data gained through testing operator reaction or even through anecdotal evidence, they literally just looked around and decided that, in their personal and uninformed view, the vision was not meaningfully affected.

In fact, because of the absence of sufficient data, Mr. Talbot attached a bombshell of a caveat to his testimony: *i.e.*, he announced that he was "*not willing to state if the design is adequate from other functions*" beyond maintaining operator area integrity, even though the relevant law requires a conclusion that an alternative design be of at least equal utility. (Talbot Depo., p. 77) (emphasis supplied). His unwillingness to render an opinion concerning adequacy for other functions is likely a result of the fact that he has "not looked at" other lift trucks or reviewed literature or industry practices to determine whether guarding of the right side of the operator's compartment is generally accepted. (Id. at pp. 140-41). Mr. Gamel's opinion was similarly based on an absence of facts regarding industry standards or practices. As set forth above, Mr. Gamel did not attempt to ascertain why this truck was designed without an enclosure, is unsure of whether any forklifts have full operator enclosures,

27

and has no idea whether the "fix" implemented by Federal Mogul has been peer-reviewed or subjected to any input from manufacturers.  (Gamel Depo., pp. 68, 69, 73).  Mr. Gamel is equally unaware of whether this sort of "fix" has ever been tested, and he failed to consider in any manner the possible impact that operator training could have had on whether the re-design was even needed.  (Id. at pp. 37-38, 54, 59, 72).  Nor is Mr. Gamel familiar with the ANSI standards that apply to the lift truck at issue in this case, so it is fair to say he did not review them for purposes of forming his opinion that the design was acceptable.  (Id. at p. 25).

Mr. Talbot's opinion concerning the alleged insufficiency of the warnings rests on equally thin factual evidence.  As Mr. Talbot testified, "[t]he *only way* you know if a warning is effective is to have people read it, look at it, use the equipment and see if it affects their behavior."  (Talbot Depo., p. 128) (emphasis supplied).  However, as set forth above, Mr. Talbot undertook *no testing whatsoever* with respect to the warnings, choosing instead to simply state that things might have been stated in a different manner.  (Id. at pp. 126-28).  In stating these baseless opinions, he did not, for instance, consider any warnings utilized by other manufacturers, consult industry standards, or review literature or standards regarding the efficiency or effectiveness of the particular warnings that Hyster used.  (Id. at pp. 126-27).

All of the absent facts and data outlined above are of critical importance in forming a sound opinion concerning the alleged defect with, and alternative design of, the forklift at issue in this case.  For one thing, the missing data is legally required in order to establish a valid alternative design under the substantive law of the State of Alabama.  See, e.g., Long v. Raymond Corp., 245 Fed. Appx. 912, 916 (11th Cir. 2007) (noting that "under the AEMLD, the plaintiff was required to present [expert] evidence that (1) the plaintiff's injuries would have been eliminated or in some way reduced by an alternative design, *and* (2) the utility of the alternative design outweighed the utility of the design actually used") (emphasis in original).

Such evidence is necessary as well in order to satisfy Rule 702.  The courts have specifically pointed out the importance of considering legal regulations and industry standards in design cases.  See, e.g., McGee v. EvenFlo Co, Inc., 2003 WL 23350439, at * 7 (M.D. Ga. Dec. 11, 2003) (excluding expert testimony on design issue after observing that the expert, *inter alia*, "chose not to research or incorporate recognized federal motor vehicle safety standards," and was "unaware of whether his opinions in this case are either consistent or inconsistent with accepted standards"). Testing of alternatives and collection of data regarding consumer, industry, and academic acceptance also has been regarded as critical.  See id. at * 9; see also, e.g., Kinser v. Gehl Co., 184 F.3d 1259, 1271-72 (10th Cir. 1999) (finding inadequate

facts or data where there was no testing of an alternative product design); Milanowicz v. The Raymond Corp., 148 F. Supp. 2d 525, 536 (D.N.J. 2001) (noting that an expert must be able to "address whether [a] modification will so affect the operation of the device that it makes it ineffective").

And obviously, without actual testing or other information to establish that the proposed modifications to the Hyster forklift would render it safer, the only evidence of such is the *ipse dixit* of the experts — something that is of near axiomatic insufficiency. See General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). That said, the opinions of Mr. Gamel and Mr. Talbot are clear examples of these uninformed, unsupported, and therefore inadmissible forms of conjecture. They must be excluded for lack of sufficient factual foundation.

> 2.     In Addition to Relying on Insufficient Data, Mr. Gamel and Mr. Talbot Failed to Utilize Any Methodology At All in Reaching Their Opinions, Much Less Apply a Methodology in a Reliable Fashion

The Supreme Court has made clear that the point of the "gatekeeping" requirement is to ensure that even qualified experts who have sufficient facts or data "employ[] in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).  In other words, experts must rely upon some form of scientifically-supportable, reliable methodology — not merely a gut instinct, intuition, or their version of common sense.

"In Daubert, the Supreme Court set out four non-exclusive criteria for [methodological] reliability determinations: '(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.' "  Wilson v. Taser Intern., Inc., 303 Fed. Appx. 708, 713 (11th Cir. 2008) (quoting McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir.2004)).  The Eleventh Circuit has explained that these "same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony."  United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004).

Even perfunctory analysis of the testimony of Mr. Gamel and Mr. Talbot demonstrates that their opinions cannot satisfy even a single one of the criteria set forth above.  The principal reason for this is that *neither of these gentlemen actually relied on any sort of recognizable methodology at all*.  They did not operate the

modified lift truck or test it or any alternative warnings to evaluate safety or efficacy. (Talbot Depo., pp. 63, 69, 126-28, 139; Gamel Depo., pp. 37, 53, 54, 55, 57, 58-59). They did not review pertinent literature to determine what safety features were needed or whether the features they proposed were acceptable.  (Talbot Depo., pp. 65, 129, 134, 139-40; Gamel Depo., pp. 25, 37-38, 46, 73).   They did not consider legal requirements and ANSI standards in order to reach their opinions.  (Talbot Depo., pp. 24-25; Gamel Depo., p. 25).   They did not endeavor to determine industry acceptance.  (Talbot Depo., pp. 134, 140-41; Gamel Depo., pp. 37-38).   They apparently did not even ask operators or other potential users whether such modifications would limit utility.  Therefore, what these witnesses have offered are raw, conclusory opinions, based on insufficient facts, and reached apparently after merely *looking at* a single type of alternative design.

Such a free-wheeling, shoot-from-the-hip style of analysis will not suffice under Daubert, since "[c]learly, a court cannot evaluate the reliability of an expert's methodology until he has actually employed one." McGee v. EvenFlo Co., Inc., 2003 WL 23350439, at * 7 (M.D. Ga. Dec. 11, 2003); Covas v. Coleman Co., Inc., 2005 WL 6166740, at * 9 (S.D. Fla. June 27, 2005) ("The absence of any discernable methodology upon which Dr. Hutter's opinions are based precludes Defendant from cross-examining Dr. Hutter on this issue.  Moreover, it also prevents the Court from

considering, as it is obligated to do under Daubert, whether Dr. Hutter's approach can be tested, can subjected to peer review, has an error rate, or has attained any level of acceptance."); Landrin v. MGA Entertainment, Inc., 2006 WL 5249735, at * 10 (S.D. Fla. Jan. 5, 2006) ("The evaluation was based upon the conclusory subjective opinion of Mr. Kitzes which he reached through a visual and physical examination of the toy. He did not rely upon his experience to integrate the data from other professionals — such as human factors experts, engineering experts, or relevant safety data concerning similar injuries. As stated by the Eleventh Circuit in Frazier, to allow an expert to give a subjective opinion merely because he is an expert would eliminate the requirement of reliability.").

Of course, to the extent the wholly subjective and ambiguous methods employed by Mr. Gamel and Mr. Thomas could be assumed to qualify as some form of identifiable methodology — and they cannot — it is clear that such methodology is not of the caliber required under Daubert.  For instance, as both of these witnesses repeatedly admitted, they performed no actual testing of the alternative design that they viewed, of the conceptual détente switch, or of the (unspecified) warnings they spoke of in their depositions.  As another court in this Circuit has observed in the past, "the absence of testing is a consistent factor in court decisions excluding expert testimony," and that "is especially true in cases dealing with product design.  McGee,

2003 WL 23350439, at * 9 (collecting cases) (internal quotations omitted).  Indeed, with respect to the warnings, Mr. Talbot specifically outlined the manner in which his proposed changes (which he failed to actually explicate) could be tested, but then went on to state that he did not attempt to do so.  (Talbot Depo., pp. 126-28).  Cf. Guinn v. AstraZeneca Pharmaceuticals LP, 602 F.3d 1245, 1255 (11th Cir. 2010) ("The reliability of Dr. Marks' methodology is further called into question by her failure to conduct the standard diagnostic techniques she normally used to rule out potential alternative causes.").

        In addition to the absence of testing to back up their conclusions, both of Vaughn's proposed experts failed to identify any peer-review or general acceptance of their methods, or to point out any error rate.  These failures are fatal to their testimony.  See, e.g., Wilson, 303 Fed. Appx. at 714 ("Simply stated, Dr. Meier does not meet any of the Daubert factors. He did not demonstrate that his opinion that TASER exposure may cause compression fractures is testable; he did not offer any error rate for his opinion; he did not show any evidence that his opinion has been peer reviewed or that he used a peer-reviewed source to reach his opinion; and, finally, he did not show the general acceptance of his opinion."); Hendrix ex rel. G.P. v. Evenflo Co., Inc., ___ F.3d ___, 2010 WL 2490760, at * 15 and n.13 (11th Cir. June 22, 2010) (holding that an expert offered no "scientifically reliable basis for his opinion,"

34

where, "[f]or example, there is no evidence that [the expert's] theory" had "been tested or subject to peer-reviewed publication."); <u>Deutz Corp. v. City Light & Power, Inc.</u>, 2009 WL 2986415, at * 6 (N.D. Ga. Mar. 21, 2009) ("plaintiff has not sufficiently demonstrated that the methodology relied upon by Dr. Avitan in forming these opinions was sufficiently reliable. In his original expert report, Dr. Avitan does not cite to any professional journals, learned treatises, or scientific literature that he utilized in formulating his opinions. Dr. Avitan did not study or perform any testing on the subject engine's parts.").

Accordingly, even if it could be determined that both witnesses are qualified, and then further found that they relied upon sufficient facts or data — a seemingly impossible conclusion — the absence of any discernable, reliably-applied methodology renders their opinion testimony inadmissible. As discussed below, the absence of a clear methodology also renders their testimony unhelpful to the trier of fact, yet *another* barrier to admissibility.

C. The Opinions of Buddy Gamel and Thomas Talbot are Not Helpful to the Finder of Fact Because They Are Not Based on Any Discernable Methodology and Represent Nothing More than <u>Lay Opinions Based on Supposed "Common Sense" Perceptions</u>

"The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact." <u>United States v. Frazier</u>, 387 F.3d 1244, 1262 (11th

Cir. 2004).   Interpreting this requirement, the Eleventh Circuit has held that "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1263-64.

As demonstrated above, the courts commonly recognize that forklift design generally, and the design of forklift safety features specifically, is a "complex" subject. Ortiz v. Yale Materials Handling Corp., 2005 WL 2044923, at *11 (D.N.J. Aug. 24, 2005) (noting that "forklift design" involves "complex safety issues," and therefore, "a jury would not be able to simply look at [a forklift's] design and determine whether or not it was defective."); see also, e.g., Brown v. Raymond Corp., 432 F.3d 640, 643-44 (6th Cir. 2005) (agreeing that a forklift is a "complex industrial machine"); Kirk v. Hanes Corp. of North Carolina, 16 F.3d 705, 708 (6th Cir. 1994) (same).   However, the opinions of Mr. Gamel and Mr. Talbot address this intricate subject area with precisely the sort of *ad hoc*, unscientific approach that consists of "simply look[ing] at [the forklift's] design and determin[ing] whether or not it was defective." Ortiz, 2005 WL 2044923, at *11.

Quite simply, this type of analysis "offers nothing more than what lawyers for the parties can argue in closing arguments," Frazier, 387 F.3d at 1263-64, *i.e.*, the forklift with the guard seems safer than the forklift without the guard.  Although that

36

proposition may be regarded as having the simplistic, superficial appeal of a closing argument, it is a dangerously under-developed and under-evaluated conclusion, as Mr. Talbot himself illustrated when volunteering that the cage and bumpers could create collateral safety problems that he had not tested.  (Talbot Depo., p. 72). Allowing such testimony would lend purported "expert" support to what is truly an untested, unscientific lay analysis of a highly complex engineering design issue.

For that reason, in addition to the others outlined above, the opinions of Mr. Gamel and Mr. Talbot must be excluded.  See Trammell v. Paxton, 2008 WL 7514367, at * 7 (N.D. Ga., Sept. 29, 2008) ("The court cannot, however, disregard Brownlee's apparent lack of methodology or analysis. Generalized conclusions that do not result from any meaningful application of the facts serve only to confuse, rather than assist, the jury.").

## IV.   Conclusion

For the reasons set forth above, the opinion testimony proffered by Buddy Gamel and Thomas Talbot does not meet the standards of Rule 702, and must therefore be excluded and not considered on summary judgment, or at trial.

s/ George W. Royer, Jr.
George W. Royer, Jr.

s/ P. Scott Arnston
P. Scott Arnston

37

LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
2101 West Clinton Avenue, Suite 102 (35805)
Huntsville, AL  35804
Telephone:  256-535-1100
gwr@lanierford.com  &  psa@lanierford.com

Attorneys for Defendant NACCO Materials Handling Group, Inc.,
successor by merger to Hyster Company

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing upon the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

>       M. Clay Alspaugh, Esquire
>       SMITH & ALSPAUGH, P.C.
>       505 North 20th Street
>       1100 Financial Center
>       Birmingham, Alabama 35203
>
>       J. Lee Roberts, Esquire
>       TURNBACH, WARREN, ROBERTS & LLOYD, P.C.
>       200 Chestnut Street, Suite A
>       Gadsden, Alabama 35902
>
>       Joseph T. Brasher
>       HAMILTON, WESTBY, ANTONOWICH & ANDERSON
>       600 West Peachtree Street
>       Suite 1700
>       Atlanta, Georgia 30308

on this the 4th day of August, 2010.

>                          s/ George W. Royer, Jr.
>                          George W. Royer, Jr.