## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **ROEL and JEAN VAUGHN,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:09-CV-570-VEH** |
| | ) |
| **HYSTER COMPANY, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case comes before the Court on the Motion of Defendant, Hyster Company, Inc. ("Hyster"),[1] to Exclude Opinion Testimony of Emmett E. ("Buddy") Gamel, III, and Thomas F. Talbot (doc. 35), filed August 4, 2010.  Hyster simultaneously filed a Motion for Summary Judgment (doc. 33).  The Plaintiffs filed a combined response to both motions (doc. 39) on August 25, 2010.  Hyster likewise filed a combined reply (doc. 41) on September 3, 2010.  Because the parties filed combined briefs addressing these motions, the court will address both motions in one

---

[1] NACCO Materials Handling Group, Inc. ("NACCO") is the successor in interest to Hyster.  However, because NACCO was not yet the successor in interest at the time that any of the events relating to the Plaintiffs' claims occurred, the court will refer to NACCO as Hyster, to avoid confusion to the reader.

opinion.  For the reasons set forth below, the motions are due to be **GRANTED**.

## II.     FACTS AND PROCEDURAL HISTORY

This is a civil action filed by the Plaintiffs, Roel and Jean Vaughn, against Hyster.  The following facts, set forth in Hyster's brief in support of its motion for summary judgment, are undisputed:

> Mr. Vaughn sustained an arm injury while operating a lift truck manufactured by Hyster. [Mr.] Vaughn asserts claims against [Hyster] [] under the Alabama Extended Manufacturer's Liability Doctrine, and for breach of the implied warranties of fitness and merchantability. [Plaintiff Jean Vaughn] asserts a derivative claim for loss of consortium. Mr. Vaughn was employed by Federal Mogul Corporation as a materials handler and was performing his job duties at its Jacksonville, Alabama plant when the subject accident occurred on March 2, 2007.   The accident occurred while [Mr.] Vaughn was operating a Hyster "standup" fork lift truck, which he had regularly operated since December of 2004. According to [Mr.] Vaughn, he maneuvered the lift truck into an aisle, and stopped the vehicle to the left of some shelves containing automotive parts.  [Mr.] Vaughn then looked down and to his right toward two pallets on the floor, to locate parts he needed to lift with the truck and move onto another pallet.  While holding in his right hand a label identifying the parts he needed to move, [Mr.] Vaughn leaned to his right to get a closer look at the pallets on the floor.  [Mr.] Vaughn does not remember how far he leaned, testifying that "I Just remember leaning over."  [Mr.] Vaughn testified that "[o]ne second I was looking at this label, and the next second I knew something bad had happened, and I was turned like sideways, and my arm was dangling."  [Mr.] Vaughn's right arm apparently struck a portion of the shelving and was severely injured.  [Mr.]  Vaughn does not know how the accident occurred.  [Mr.] Vaughn does not believe that the vehicle moved on its own.

Mr. Vaughn is "fairly sure" that an operating manual was located on the lift truck, but he does not recall reading it. In a section warning operators to "use common sense," the operating manual warned that operators should "[k]eep arms, legs, and head inside operator's compartment." Mr. Vaughn also acknowledged that there were various warning labels on the vehicle. [Mr.] Vaughn testified that "I saw them on there, and I'm sure I read part of it, but I don't know if I read letter for letter." Like the operating manual, the warning labels instructed operators to "[k]eep arms, legs and head inside operator's compartment." In February 2004, approximately three years prior to the accident, Mr. Vaughn completed a Federal Mogul "Lift Truck Operators Training Course Written Exam." In the "true or false" portion of the exam, [Mr.] Vaughn indicated that the following statement was false: "[I]t is OK to have your feet or hands outside the running lines of the equipment." [Mr.] Vaughn testified that he knew he could be injured if he did not keep his arms inside the operator's compartment.

(AF 3-23).[2]  Sometime after the accident, Mr. Vaughn's employer, Federal Mogul,

Corp., added a wire mesh guard and rubber bumpers to the forklift. (Def.'s Br., doc.

36, p. 3; Pl.'s Br., doc. 39, p. 6, filed Aug. 25, 2010).

---

[2]The Plaintiffs do not dispute these relevant facts as set forth in Hyster's motion for summary judgment. (Pls.'s Resp. to Def.'s Renewed Mot. for Summ. J., doc. 39, p. 3, filed Aug. 25, 2010). These facts are referred to herein as "Admitted Facts," or "AF,"and refer to the Defendant's Statement of Undisputed Material Facts set forth in Hyster's Brief in Support of Renewed Motion for Summary Judgment, doc. 34, ¶¶ 1-24, filed Aug. 4, 2010. The Plaintiffs also provided additional facts, referred to as Plaintiffs' Additional Undisputed Facts and Additional Disputed Facts. As pointed out by Hyster, Plaintiffs' Undisputed Fact 1. and Disputed Facts 1. through 4. are not supported by a specific reference to evidence in the record, as required by Appendix II of the court's Uniform Initial Order. Further, statements of counsel are not evidence. *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009), *quoting United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990). Therefore, those unsupported facts are not considered facts for summary judgment purposes. In addition, Hyster disputes Plaintiffs' Undisputed Fact 2. because Plaintiff Roel Vaughn testified that he did not know how the accident occurred, and because Plaintiffs admitted this fact. (AF 14; Vaughn Dep., doc. 26-1, pp. 30, 267-268, filed Jan. 25, 2010).

The Plaintiffs proffered two expert witness, Thomas F. Talbot, P.E., Ph.D. and Emmett E. ("Buddy") Gamel, III, to offer opinions on the design defects of the forklift and the alternative designs available for preventing the injuries sustained by Plaintiff Roel Vaughn.[3]  Gamel opined as follows:

> In my opinion the operator compartment was unguarded, but should have been so as to prevent a foreseeable event such as an operator extending a portion of his body outside the operator compartment, and in this case his arm, and/or even his head to visualize locations from which he was to pick materials. . . .  The failure to guard the right side created a pinch point, if for whatever reason, an arm extended outside [the] operator compartment, . . . there could have been an accidental engagement by leaning into the stick.

> Regardless, a cage system such as was installed post-accident would have prevented extension of the arm, or other body parts, from the lateral side of the operator compartment and have prevented contact between external objects (the rack) and the forklift itself.

(Report of Emmett E. (Buddy) Gamel, III, doc. 39-2, p. 5, filed Aug. 25, 2010). Gamel concluded that "without proper guarding such as was subsequently provided by Federal Mogul, this lift truck was dangerous and defective as a consequence of failure to provide adequate design and/or guards to prevent a foreseeable pinch pont." (Report of Gamel, doc. 39-2, p. 7).  Gamel also opined that the joystick on the Hyster forklift should have been equipped with some type of "safety button or detente or something to prevent the operator from accidentally leaning forward in his –some part

---

[3]Hyster contends that this fact is immaterial.

of his body pushing on the directional control." (Gamel Dep., doc. 37-1, p. 39:6-24).

Talbot similarly concluded that "the lift when operated by Vaughn was defective in that the operator compartment was not adequately guarded so as to prevent extension of body parts, including arms so as to prevent contact with stationary objects." (Report of Thomas F. Talbot, Ph.D., doc. 39-1, p. 9, filed Aug. 25, 2010). In addition, Talbot opined that "modification by adding the wire guard, standing alone, would have been adequate to have prevented extension of his arm outside so that it would not have gained contact with the frame and further that the rubber bumpers placed on the vehicle added additional spacing between the frame of the operator compartment and any stationary or other objects with which it might come in contact." (Report of Talbot, doc. 39-1, p. 10). Talbot also determined that the admonitions included in the forklift operating manual "are not adequate 'warnings', and do not replace adequate guarding, particularly since the hazard, i.e., creation of a pinch point, could have been guarded against simply by the screen or wire mesh that was placed on the machine subsequent to Vaughn's injury." (Report of Talbot, doc. 39-1, p. 11).

Hyster seeks to exclude the testimony of both of these experts. The court will first consider the motion to exclude the experts' testimony because the decision on the motion for summary judgment depends upon whether the expert testimony is

excluded.

## II.   STANDARD FOR REVIEWING EXPERT TESTIMONY[4]

In evaluating expert testimony, the Eleventh Circuit Court of Appeals has

outlined the following analysis:

> The starting point for our analysis is Rule 702 of the Federal Rules of
> Evidence, which controls the admission of expert testimony. It provides:
>
> > If scientific, technical, or other specialized knowledge will
> > assist the trier of fact to understand the evidence or to
> > determine a fact in issue, a witness qualified as an expert
> > by knowledge, skill, experience, training, or education,
> > may testify thereto in the form of an opinion or otherwise,
> > if (1) the testimony is based upon sufficient facts or data,
> > (2) the testimony is the product of reliable principles and
> > methods, and (3) the witness has applied the principles and
> > methods reliably to the facts of the case.
>
> As the Supreme Court made abundantly clear in *Daubert*, Rule 702
> compels the district courts to perform the critical "gatekeeping" function
> concerning the admissibility of expert *scientific* evidence. 509 U.S. at
> 589 n. 7, 597, 113 S.Ct. at 2795 n. 7, 2798. The trial courts are also
> required to play the same gatekeeping function considering the
> admissibility of technical expert evidence. *Kumho Tire*, 526 U.S. at 147,
> 119 S.Ct. at 1174. This function "inherently require[s] the trial court to
> conduct an exacting analysis" of the *foundations* of expert opinions to
> ensure they meet the standards for admissibility under Rule 702.
> *McCorvey,* 298 F.3d at 1257.
>
> The importance of *Daubert*'s gatekeeping requirement cannot be

---

[4]The following overall framework and analysis was used in *Thomas v. Evenflo Co., Inc.*, No. 2:02-CV-2001-VEH, Mem. Op., doc. # 113 (N.D. Ala. Aug. 11, 2005), *aff'd*, 205 F. App'x 768 (11th Cir. 2006).

overstated. As the Supreme Court framed it in *Kumho Tire*: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152, 119 S.Ct. at 1176. The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991) ("*Weinstein*")). Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703.

Thus, it comes as no surprise that in determining the admissibility of expert testimony under Rule 702, we engage in a rigorous three-part inquiry. Trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794). While there is inevitably some overlap among the basic requirements--qualification, reliability, and helpfulness--they remain distinct concepts and the courts must take care not to conflate them. *Quiet Tech.*, 326 F.3d at 1341.

The proponent of expert testimony always bears "the burden to show that his expert is 'qualified to testify competently regarding the matters he intend [ed] to address; [ ] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact.' " *McCorvey*, 298 F.3d 1253, 1257 (alterations in original) (quoting *Maiz*, 253 F.3d at 664). The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.

Turning first to the qualification of the expert, we observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, *experience*, training, or education." (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony." Fed.R.Evid. 702 advisory committee's note (2000 amends.).

Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express. As we observed in *Quiet Technology*, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability.... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1341-42. Quite simply, under Rule 702, the *reliability* criterion remains a discrete, independent, and important requirement for admissibility.

Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the

opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' " Fed.R.Evid. 702 advisory committee's note (2000 amends.) (emphasis added); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"). If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

Thus, it remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation-- i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. As the Supreme Court put it, "the Rules of Evidence-- especially Rule 702--... assign to the trial judge the task of ensuring that an expert's testimony ... rests on a reliable foundation." Id. at 597, 113 S.Ct. at 2799.

When evaluating the reliability of scientific expert opinion, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93, 113 S.Ct. at 2796. To evaluate the reliability of scientific expert opinion, we consider, to the extent practicable:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Quiet Tech.*, 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256 (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. at 2796-97)).

These factors are illustrative, not exhaustive; not all of them will

apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. *See Kumho Tire*, 526 U.S. at 150- 152, 119 S.Ct. at 1175-76; Fed.R.Evid. 702 advisory committee's note (2000 amends.); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.1999) ("[N]ot only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.").

The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176; *see also Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir.1999) ("In determining whether an expert's testimony is reliable, the *Daubert* factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on 'experience' or 'training.' "). As the Supreme Court explained in *Kumho Tire*:

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

526 U.S. at 151, 119 S.Ct. at 1176. Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful. As a result, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 152, 119 S.Ct. at 1176. Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate

the reliability of the testimony before allowing its admission at trial. *See* Fed.R.Evid. 702 advisory committee's note (2000 amends.) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." (emphasis added)).

The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *See United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *See* 4 *Weinstein's Federal Evidence* § 702.03[2] [a].

Because of the powerful and potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, *see Rouco*, 765 F.2d at 995, or if the expert testimony is cumulative or needlessly time consuming. *See, e.g., Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir.1985) (per curiam) (finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702"); *see also United States v. Stevens*, 935 F.2d 1380, 1399 (3d Cir.1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence"). Indeed, "the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses." *Weinstein*, 138 F.R.D. at 632; *see also Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). Simply put, expert testimony may be assigned talismanic significance in the eyes of lay

11

jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.

*United States v. Frazier,* 387 F.3d 1244, 1259 -1263 (11th Cir. 2004) (footnotes omitted).

## III.    ANALYSIS

### A.    Gamel's Qualifications[5]

Hyster argues that Gamel is "not qualified to render expert opinions concerning the design or safety of narrow aisle lift trucks or to opine regarding the sufficiency of safety warnings on such trucks."  (Def.'s Br., doc. 36, p. 17, filed Aug. 4, 2010).  According to Hyster, the relevant field at issue in this case "is that of forklift design, and specifically the design of forklift safety features."  (Def.'s Br., p. 18).  Hyster contends that, although Gamel's qualifications are based upon "the 'on-the-job experience' that he has gained as a *mechanic* performing *maintenance* and *repairs* on industrial vehicles and machinery, including forklifts," (Def.'s Br., p. 18, *citing* Gamel Dep., doc. 37-1, p. 17, filed Aug. 4, 2010), Gamel "has never worked *at all* on the forklift model at issue in this case."  (Def.'s Br., p. 19, *citing* Gamel Dep., doc. 37-1, p. 60).  In addition, Hyster contends that Gamel "has never performed any *design work* or *safety design* with respect to a powered industrial vehicle of any

_____

[5]Hyster does not challenge the qualifications of the Plaintiffs' other expert, Thomas F. Talbot, Ph.D.

type." (Def.'s Br., p. 19, *citing* Gamel Dep., p. 26). Moreover, Hyster notes that Gamel is not a design engineer. Hyster further notes that Gamel's expertise in the field of forklift design and safety is based upon his common sense ability. Hyster argues that Gamel's "experience performing *mechanical repair work* on *other models* of lift trucks, and his alleged 'common sense' ability to comprehend the design of safety features for lift trucks" are insufficient to render Gamel qualified as an expert in the field of forklift design and safety, and specifically regarding the Hyster forklift at issue in this case.

The Plaintiffs contend that Gamel is qualified to testify in this case. According to the Plaintiffs, "experience alone - or experience in conjunction with other knowledge, skill, training or education - may [] provide a sufficient foundation for expert testimony." (Pl's Br., doc. 39, p. 9, *citing* FED. R. EVID. 702 advisory committee's note). The Plaintiffs contend that Gamel "is a licensed forklift operator who trains other operators of forklifts." (Pl.'s Br., doc. 39, p. 10, filed Aug. 25, 2010). The Plaintiffs also contend that Gamel "has daily knowledge and experience and training with forklift operation and equipment necessary to protect, guard and warn of the dangers associated with same." (Pl.'s Br., doc. 39, p. 10). Based upon Gamel's experience, the Plaintiffs contend that he is qualified to testify as an expert in this case.

"*Daubert* [] stresses that '[t]he inquiry envisioned by Rule 702 is . . . a flexible one.'" *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001), *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469 (1993).  "Many factors will bear on the inquiry, and [there is no] definitive checklist or test." *Maiz v. Virani,* 253 F.3d at 665, *quoting Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796.

The Court's own review has discovered that, generally, the standard for qualifying expert witnesses is liberal.  *See, e.g., In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 855 (3d Cir. 1990); *United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977); *Thomas v. Newton Int'l Enterprises, Inc.*, 42 F.3d 1266, 1269 (9th Cir. 1994); *Gardner v. General Motors Corp.,* 507 F.2d 525, 528 (10th Cir. 1974); *see also, Collins By and Through Kay v. Seaboard Coast Line R. Co.,* 675 F.2d 1185, 1194 (11th Cir. 1982) (recognizing Eleventh Circuit's "liberal construction" of Rule 702). A witness may be qualified as an expert if he possesses a specialized knowledge, skill, experience, training, or education.  FED. R. EVID. 702.  Thus, it is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render the opinion at issue because the witness lacks a certain educational or other experiential background. *See Poulis-Minott v. Smith*, 388 F.3d 354, 360 (1st Cir. 2004); *see e.g. McCullock v. H.B. Fuller Co.* , 61 F.3d 1038,

1042 (2d Cir. 1995); *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 855 (3d Cir. 1990); *Dickenson v. Cardiac and Thoracic Surgery of E. Tennessee*, 388 F.3d 976, 980-982 (6th Cir. 2004).  Similarly, it is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render an opinion because the witness lacks expertise in specialized areas that are directly pertinent to the issues in question, if the witness has educational and experiential qualifications in a general field related to the subject matter of the issue in question.  *See e.g. Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (plaintiff's economics expert was qualified to offer opinion regarding plaintiff's lost value damages arising from a real estate investment scheme, because calculating economic losses resulting from defendants' conduct was sufficiently within his expertise; his lack of experience in real estate development and resulting ignorance about how pilfered funds would have been invested went to foundation for expert's testimony, not to his qualifications).  On the other hand, if a proffered witness's qualifications are lacking, the trial court should exclude that witnesses as unqualified.  *See e.g. United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (proposed expert witness's background did not qualify him as expert, and trial court did not abuse discretion by excluding his testimony).

The burden is on the Plaintiffs to show that their expert is qualified.  *United*

15

*States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  The Plaintiffs have failed to show how Gamel's experience in the field of operating and repairing powered industrial vehicles, including forklifts, provides a sufficient basis for qualifying Gamel as an expert in the field of forklift design and forklift safety feature design. In fact, Gamel testified that he has never been involved in the design of a forklift, although, on one occasion, he was involved in the design of an attachment to a forklift.  (Gamel Dep., doc. 37-1, p. 26:3 - 28:3).  As the committee note to Rule 702 states, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  FED. R. EVID. 702 advisory committee's note (2000 amends.). The Plaintiffs have failed to do so.  Gamel does not possess sufficient knowledge, skill, experience, training, or education to render an opinion concerning the design or safety feature design of forklift trucks.  Accordingly, Gamel is not qualified as an expert to render an opinion in this case.

> **B.    Whether the Methodology By Which Gamel and Talbot Reach Their Conclusions Is Sufficiently Reliable As Determined By the Sort of Inquiry Mandated in *Daubert*.**

> **1.    Gamel's Opinions**

Hyster contends that reliability is lacking because Gamel's opinions are not

based upon sufficient facts or data, and because Gamel did not use any methodology in reaching his opinions. Even assuming that Gamel is qualified to testify as an expert on the issues of design and safety feature design, his testimony would be excluded because it is not reliable.

As noted above, Gamel's opinions are essentially based upon his experience in the field of operating and repairing lift trucks. "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). "'In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community.'" *Frazier*, 387 F.3d at 1262, *quoting Kumho Tire*, 526 U.S. at 151, 119 S.Ct. at 1176. "Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Frazier*, at 1262, *citing* Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis in original). "'The trial judge in *all* cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.'" *Id., quoting* Fed. R. Evid. 702 advisory committee note (2000

amends.).

In this case, Gamel visited the site of the accident and viewed the Hyster forklift involved in the accident, and a similar Hyster forklift with modifications by Federal Mogul.[6]  In his deposition, Gamel agreed that "it would [have been] a good idea" for the modifications by Federal Mogul to have been part of the original design of the Hyster forklift.  (Gamel Dep., doc. 37-1, pp. 36:21 - 37:2).  His opinion was "[b]ased on [his] observations there at the Federal Mogul plant," and on "[t]he design of the vehicle as I saw it, the changes that they made, and watching the operation of the vehicle by that safety manager."  (Gamel Dep., doc. 37-1, p. 37:12-16).  He admitted that other than watching the safety manager operate the vehicle during his visit at the Federal Mogul plant, he had not conducted any tests on the changes made by Federal Mogul.  (Gamel Dep., doc. 37-1, p. 37:17-20).  Gamel also admitted that he had not researched nor did he have any knowledge whether the changes by Federal Mogul are accepted in the industry for powered industrial vehicles.  (Gamel Dep.,

---

[6]According to Gamel, the Hyster forklift involved in the accident has not been modified. A similar Hyster forklift was modified by Federal Mogul by adding a wire mesh cage and rubber bumpers. (*See* Gamel Dep., doc. 37-1, p. 42:10 - 43:6).  Apparently, this was a misunderstanding on his part.  The parties appear to agree that the Hyster forklift that Mr. Vaughn was using at the time of the accident was modified by Federal Mogul subsequent to the accident.  (Def.'s Br. in Support of Mot. to Exclude Opinion Testimony, doc. 36, p. 3, filed Aug. 4, 2010; Pl.'s Opposition to Def.'s Renewed Mot. for Summ. J. and Mot. to Exclude Opinion Testimony, doc. 39, p. 6, filed Aug. 25, 2010; Talbot Dep., doc. 37-2, p. 55:12-20).

doc. 37-1, pp. 37:21 - 38:2).  In addition, Gamel admitted that he had not prepared, nor was he aware of, any publication regarding, or peer review of, the modifications by Federal Mogul.  When asked if he had "any training that [he] [could] point to with respect to design or safety of stand-up narrow aisle forklifts, Gamel responded, "[o]ther than a degree of common sense, no." (Gamel Dep., doc. 37-1, p. 38:10-14). Gamel further testified that the rubber bumpers added by Federal Mogul may have "eliminated the amount of injury" to Mr. Vaughn, but Gamel admitted that he had not done a complete analysis to confirm that assertion.  (Gamel Dep., doc. 37-1, p. 53:2 - 20).  Finally, Gamel admitted that he did not know why the Hyster forklift was designed without an enclosure, as was added by Federal Mogul.  (Gamel Dep., doc. 37-1, pp. 68:22 - 69:1).

Gamel also opined that the joystick on the Hyster forklift should have been equipped with some type of "safety button or detente or something to prevent the operator from accidentally leaning forward in his –some part of his body pushing on the directional control."  (Gamel Dep., doc. 37-1, p. 39:6-24).  In his deposition, Gamel admitted that he was not aware of such a safety button being used in the field of forklifts.  He also admitted that he had not read any literature about the use of a safety button, or that such a safety button was accepted in the lift truck industry. Moreover, he was not aware that any such safety button had been the subject of peer

review.

In the Plaintiffs' response, the Plaintiffs' did not address the reliability of Gamel's testimony regarding either of his opinions. They offered no explanation, no factual support, no case law, and no argument to support a conclusion that the methodology used by Gamel in formulating his opinions is reliable. In short, the Plaintiffs have not referenced any specific methodology used by Gamel. Even assuming the Plaintiffs have done so, the Plaintiffs have cited no evidence of the methodology's known rate of error or a basis for determining if the method is generally accepted. Lastly, Gamel did not conduct any testing on the modifications by Federal Mogul, or on the proposed safety button. Based upon the record, the court cannot conclude that the methodology used by Gamel in formulating his opinions is reliable. His testimony must therefore be excluded.

### 2.    Talbot's Opinions

Hyster contends that reliability is lacking because Talbot's opinions, like Gamel's, are not based upon sufficient facts or data, and because Talbot did not use any methodology in reaching his opinions.

Talbot opined in his deposition that Hyster "should have designed some sort of a strain to keep an operator from getting his body part out." (Talbot Dep., doc. 37-2, p. 57:12-14). Talbot also stated that the modifications by Federal Mogul "is a

20

reasonable alternative design. . . . [He] think[s] there may be better designs.  But this design [by Federal Mogul] eliminates this type of accident." (Talbot Dep., doc. 37-2, p. 60:18-23).  He conceded that the changes made by Federal Mogul could create a different problem.  (Talbot Dep., doc. 37-2, p. 72:17-23).  He also stated that he approves of a concept of Federal Mogul's design, but that he was "not willing to state the design is strong enough from a strength standpoint," or that "the design is adequate [for] other functions."  (Talbot Dep., doc. 37-2, p. 77:5-15).  Talbot admitted that he had not conducted any tests on the modifications to the Hyster forklift.  (Talbot Dep., doc. 37-2, p. 62:18-19; 64:1-7).  He also indicated that he was not aware that the modifications have been subjected to peer review, or that any studies have been conducted on the modifications to determine if the modifications are generally accepted in the industry.  (Talbot Dep., doc. 37-2, p. 65:4-12).  Talbot also was not aware if other forklift manufacturers have used modifications similar to those used by Federal Mogul.  (Talbot Dep., doc. 37-2, p. 65:19 - 66:7).

Talbot also opined that the warnings were inadequate.  In his deposition, he stated that there should have been a warning sticker on the forklift "illustrating stay inside the operator cage." (Talbot Dep., doc. 37-2, p. 115:2-6).  He also testified as follows:

I have not studied these specific warnings and people's reactions

21

to these specific warnings for this specific machine.  You would have to take a bunch of operators and tell them to read it and then observe their operation of a machine to see if they follow it.

We know that when you have warnings they're not a hundred percent followed.

(Talbot Dep., doc. 37-2, p. 129:17-24).  He also testified that "if you can eliminate a hazard you don't need a warning."  (Talbot Dep., doc. 37-2, p. 81:8-10).  Talbot agreed that he would not have worded the warning stating "'[k]eep arms, legs and head inside operator's compartment,'" any differently.  (Talbot Dep., doc. 37-2, p. 81:13-17).  He also did not propose an alternative warning.  (Talbot Dep., doc. 37-2, p. 81:18-21).

As with Gamel's opinions, the Plaintiffs did not address the reliability of Talbot's testimony in their response.  They offered no explanation, no factual support, no case law, and no argument to support a conclusion that the methodology used by Talbot in formulating his opinions is reliable.  According to the Plaintiffs, Talbot inspected the forklift involved in the accident and similar forklifts; "investigated the accident scene, reviewed photographs and utilized [his] skill, experience, training and knowledge in order to come to [his] [] conclusions."  (Pl.'s Opp. Br., doc., 39, p. 7). Plaintiffs also contend that "Talbot's opinions are formulated on all of the above-stated material and information as well as his personal knowledge and over forty (40)

22

years of education, training, knowledge, skill and experience in failure analysis methods, testing, design, results and application of products." (Pls.' Opp. Br., p. 10). These conclusory statements regarding Talbot's opinions are simply insufficient to show that the methodology used by Talbot in formulating his opinions is reliable. More specifically, the Plaintiffs have not shown what scientific technique was used by Talbot. In addition, they have failed to show the known or potential rate of error of the particular scientific technique, and whether that technique is generally accepted in the scientific community. Lastly, Talbot did not conduct any testing on the modifications by Federal Mogul, or on any proposed improvements to the warnings. For these reasons, Talbot's testimony must be excluded.

### C.      Whether the Opinions Assist the Trier of Fact

Having determined that the methodology, or lack thereof, utilized by Gamel and Talbot in formulating their opinions is not reliable, the court likewise concludes that their opinions would not assist the trier of fact. "Generalized conclusions that do not result from any meaningful application of the facts serve only to confuse, rather than assist, the jury." *Trammell v. Paxton*, No. 2:06-CV-193, 2008 WL 7514367, at *7 (N.D. Ga. Sept. 29, 2008).

## IV.   SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See, e.g., Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See, e.g., Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the

24

evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.* facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden

25

of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## V.    ANALYSIS[7]

---

[7]The court set forth the facts above in Section II.   The court is mindful that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.  *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light

Plaintiff Roel Vaughn has asserted claims pursuant to the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), a claim of breach of the implied warranty of merchantability, and a claim of breach of the implied warranty of fitness for a particular purpose.  In addition, Plaintiff Jean Vaughn has asserted a claim of loss of consortium.

With regard to the claim of breach of the implied warranty of fitness for a particular purpose, the Plaintiffs did not address this claim in their response to the summary judgment motion.  Therefore, this claim is abandoned.  *See, e.g.*, *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  For this reason, the claim of breach of implied warranty of fitness for a particular purpose is due to be **DISMISSED**.

To establish liability in an AEMLD action, a plaintiff must prove that the product was defective and that the plaintiff's injury is causally related to the product's defective condition.  *See Verchot v. General Motors Corp.*, 812 So. 2d 296, 301 (Ala. 2001).  In order to meet this burden, expert testimony is required.  *See Bagley v.*

---

most favorable to the non-moving party).  The statement of facts does not represent actual findings of fact.  *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided the statement of facts simply to place the court's legal analysis in the context of this particular case or controversy.

*Mazda Motor Corp.* 864 So. 2d 301, 313 (Ala. 2003) (affirming summary judgment

on the plaintiff's AEMLD claim where the plaintiff's expert was prohibited from

testifying).  "In order to sustain a cause of action under breach of warranty, plaintiff

must prove the existence of such warranty, breach, and proximate causation of

damages."  *See Clark v. Allied Healthcare Products, Inc.*, 601 So. 2d 902, 903 (Ala.

1992).

The Plaintiffs' experts, Gamel and Talbot, are Plaintiffs' sole source of

evidence on the claims under the AEMLD and the breach of warranty claim.  Because

the testimony of these witnesses has been excluded, there is no evidence to support

the claims of Plaintiff Roel Vaughn under the AEMLD and the breach of the implied

warranty of merchantability claim.[8]  The Motion for Summary Judgment in favor of

---

[8]Plaintiffs correctly note that expert testimony may not be required to establish a claim of breach of an implied warranty of merchantability under Alabama law.  *See Ex parte General Motors Corp.*, 769 So.2d 903, 913 (Ala. 1999).  Even assuming that the claim in this case does not require expert testimony, the Plaintiffs must, however, in opposition to a summary judgment motion, produce significant, probative evidence demonstrating a genuine issue for trial.  In their response, the Plaintiffs merely noted that "Plaintiffs' testimony regarding the unmerchantable quality of the subject forklift is therefore sufficient to defeat Defendant's summary judgment motion." (Pls.' Opp. Br., doc. 39, p. 17).  Although Plaintiffs' counsel filed Mr. Vaughn's deposition, Plaintiffs never cited to any portion of that testimony as evidence which would support this claim.  As stated in note 2, *supra*, and as required by Appendix II of the Uniform Initial Order, the Plaintiffs must support each statement of fact with specific reference to those portions of the evidentiary record that support it.  Statements of counsel are not evidence.  *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009), *quoting United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990).  And, as the Plaintiffs admitted, Plaintiff Roel Vaughn does not know how the accident occurred.  (AF 14).  For these reasons, the Plaintiffs have failed to provide any evidence to support this claim.

Hyster is therefore due to be **GRANTED** as to all of the claims of Plaintiff Roel Vaughn against Hyster.

Plaintiff Jean Vaughn's claim for loss of consortium is a derivative claim.  Her claim fails if Roel Vaughn's claims fail.  *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So.3d 1185, 1196 (Ala. 2008).   Because Hyster is entitled to summary judgment on all of Roel Vaughn's claims, Hyster is likewise entitled to summary judgment on Jean Vaughn's loss of consortium claim.

## <u>CONCLUSION</u>

For the reasons set forth above, the Defendant's Motion to Exclude Opinion Testimony of Emmett E. ("Buddy") Gamel, III and Thomas F. Talbot and Motion for Summary Judgment are hereby **GRANTED.**  Summary judgment is hereby entered in favor of Defendant, Hyster Company, Inc.

**DONE** and **ORDERED** this the 3rd day of December, 2010.


**VIRGINIA EMERSON HOPKINS**
United States District Judge